**Louis D. HALL, Sr., Petitioner,**

v.

**DEPARTMENT OF THE TREASURY,**
**Respondent.**

**No. 00–3067.**

United States Court of Appeals,
Federal Circuit.

DECIDED: Sept. 4, 2001.

Larry J. Adkins, Associate General Counsel, National Treasury Employees Union, of Washington, DC, argued for petitioner. With him on the brief were Gregory O'Duden, General Counsel, and Barbara A. Atkin, Deputy General Counsel.

Thomas P. Reilly, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for respondent. With him on the brief were David M. Cohen, Director, and Todd M. Hughes, Assistant Director. Of counsel on the brief was Thomas F. Dower, Counsel, U.S. Department of the Treasury, Office of Associate Chief Counsel.

Before GAJARSA, Circuit Judge, ARCHER, Senior Circuit Judge, and LINN, Circuit Judge.

LINN, Circuit Judge.

Louis D. Hall appeals the decision of the Merit Systems Protection Board ("MSPB" or "Board"), denying law enforcement officer service credit for his duties as a Canine Enforcement Officer. *Hall v. Dep't of the Treasury*, No. DA–0831–98–0507–I–1, 1999 WL 805320 (Sept. 29, 1999). Because the Board's factual determinations are supported by substantial evidence and its legal conclusions are not arbitrary, capricious, or an abuse of discretion, and are otherwise in accordance with law, we affirm the Board's denial of service credit for the period at issue in this appeal. However, because the Department of the Treasury ("Treasury") waived its right to request limitation of the time period for which the Board may review Hall's entitlement to service credit, we hold that the Board erred in restricting the time period at issue in Hall's appeal. Thus, we reverse that portion of the decision and remand for a determination of whether Hall's previous duties qualify for the service credit he requests.

## BACKGROUND

Petitioner, Louis D. Hall, Sr., is a Canine Enforcement Officer ("CEO") with the United States Customs Service. He has been employed as a CEO since 1979, except for a period between May 1987 and July 1989. Hall filed requests for Law Enforcement Officer ("LEO") service credit on December 22, 1994, December 22, 1995, December 22, 1996, and on December 22, 1997. On June 24, 1998, Treasury denied each of his requests for LEO service credit. LEO service credit would have permitted Hall to retire with an increased annuity after becoming fifty years of age and completing twenty years of service as a LEO. 5 U.S.C. § 8336(c)(1) (1994). Hall appealed Treasury's 1998 denial to the MSPB.

Prior to Hall's hearing on October 20, 1998, the administrative judge limited the period of retroactive service for which Hall could seek LEO service credit to one year prior to each of his requests for LEO service credit. Thus, the period for review

of Hall's duties was limited to December 22, 1993 through December 21, 1997. This ruling was based on 5 C.F.R. § 831.906(e), which provides that credit for past LEO service will not be granted for a period greater than one year prior to the date of the employee's request for such credit. In an initial decision dated November 25, 1998, the administrative judge held that Hall had not established that he is entitled to receive LEO service credit for his CEO duties from December 22, 1993 through December 21, 1997. Hall appealed the administrative judge's determination regarding LEO service credit, and her decision to limit the period for review of his duties. On September 29, 1999, the full Board denied Hall's request for review, thereby adopting the administrative judge's initial decision as its final decision. Hall timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9) (1994).

## DISCUSSION

### Standard of Review

■ This court must affirm an MSPB decision unless it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c)(1)-(3) (1994); *Hayes v. Dep't of the Navy*, 727 F.2d 1535, 1537 (Fed.Cir.1984). The burden of establishing reversible error in the Board's decision rests upon Hall. *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed.Cir. 1998).

### Analysis

There are two main issues present in this appeal. The first issue is whether the Board's conclusion that Hall had not shown that he is entitled to receive LEO

service credit is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Hannon v. Dep't of Justice*, 234 F.3d 674, 677 (Fed.Cir.2000). The second issue is whether the Board erred in limiting the period for review of Hall's duties to December 22, 1993 through December 21, 1997.

### I

The relevant statute for LEO service credit states that "[a]n employee who is separated from the service after becoming 50 years of age and completing 20 years of service as a *law enforcement officer* ... is entitled to an annuity." 5 U.S.C. § 8336(c)(1) (1994) (emphasis added). "Law enforcement officer" is defined as "an employee, the duties of whose position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States...." 5 U.S.C. § 8331(20) (1994). "Law enforcement officer" is further defined by regulation to exclude employees whose duties involve "maintaining order, protecting life and property, guarding against or inspecting for violations of law, or investigating persons other than persons who are suspected or convicted of offenses against the criminal laws of the United States." 5 C.F.R. § 831.902 (2000). The "primary duties" of a position are those that "[a]re paramount in influence or weight; that is, constitute the basic reasons for the existence of the position; [o]ccupy a substantial portion of the individual's working time over a typical work cycle; and [a]re assigned on a regular and recurring basis." 5 C.F.R. § 831.902(1) (2000).

In determining whether Hall's duties as a CEO were primarily the investigation, apprehension, or detention of criminal suspects, the Board considered his position

description. The CEO position description states in relevant part:

> [T]he incumbent of this position serves as an enforcement officer with responsibility to enforce laws governing the importation of merchandise; interdict smuggled merchandise or contraband; detect violations of Customs laws and those of other federal agencies, e.g., DEA, Immigration, Agriculture; and arrest, if warranted, persons involved in the violations. The major portion of the incumbent's time is spent working directly with his/her dog in one of three work situations: (1) *vehicle search* (which includes vessels, trains, aircraft, trucks and autos); (2) *cargo and baggage processing;* or (3) *mail processing* .... Trains and utilizes dogs and special detection equipment used in interdiction of drugs and other prohibited substances.

(emphasis added).

Regarding the Board's determination that Hall failed to show that he is entitled to receive LEO service credit, Hall argues that the Board erred in failing to use its own interpretation, as set forth in prior Board decisions, of the statutory definition of an LEO in evaluating Hall's duties. Hall argues that the Board instead placed erroneous weight on the *Bingaman* considerations using them as a substitute for the statutory definition. *See Bingaman v. Dep't of the Treasury,* 127 F.3d 1431, 1435 (Fed.Cir.1997).

■ Hall asserts that the Board has appropriately formulated a definition of the terms "investigation" and "apprehension," based on the text of the statute and the legislative history.[1] Hall cites *Hobbs v. Office of Personnel Management,* 58 M.S.P.R. 628 (1993), and *Ferrier v. Office of Personnel Management,* 66 M.S.P.R. 241 (1995), as defining the term "investigate." In *Hobbs,* the Board noted that "Webster's Ninth New Collegiate Dictionary 636 (1990) defines 'investigate' as: 'to observe or study by close examination and systematic inquiry' or 'to make a systematic examination; esp[.] to conduct an official inquiry.'" 58 M.S.P.R. at 632 n. 2.

In *Ferrier,* the Board stated that "investigation in section 8331(20) refers to criminal investigation.... Factors that distinguish criminal investigation from non-criminal investigation include unusual physical hazards for the investigator arising from frequent contacts with criminals and suspected criminals, working for long periods without a break, on-call status 24 hours a day, and carrying weapons.... An investigation is an observation or study by close examination and systematic inquiry." 66 M.S.P.R. at 244 (internal citations omitted) (emphasis added).

As to the *Bingaman* considerations, Hall asserts that they should not have been used by the Board to usurp the plain language of the statute as interpreted in *Hobbs* and *Ferrier.* Hall, like many other LEO service credit applicants with similar appeals presently pending before this court, reads the statutory language to require him to simply prove that his duties "are primarily the investigation, apprehension, or detention of ... suspected or con-

---

1. Regarding the meaning of the term "apprehension," the Board has stated that apprehension is the "seizure, taking, or arrest of a person on a criminal charge." *Ferrier v. Office of Pers. Mgmt.,* 66 M.S.P.R. 241, 244 (1995) (citing Black's Law Dictionary 101 (6th ed. 1990)). Because Hall acknowledged in his own testimony that he did not apprehend anyone in the time period at issue, whether the Board erred in ignoring its own prior definition of "apprehension" is irrelevant. While Hall's duties indicate that he *causes* the apprehension of criminal suspects, the statute is written to cover those who apprehend criminal suspects, not those who cause the apprehension of criminal suspects.

victed [criminals]." 5 U.S.C. § 8331(20) (1994). Hall, in effect, argues that being required to present proof regarding the considerations set forth in *Bingaman*, when such factors are not set forth in the statute (or even the legislative history), is unfair and improper.

 We do not consider Hall's argument to be persuasive. The *Bingaman* considerations are not a substitute for and do not supplant or usurp the language of the statute. 5 U.S.C. § 8331 serves as the ultimate measure of LEO credit activity. In "capturing the essence of what Congress intended" in enacting 5 U.S.C. § 8331, the *Bingaman* considerations serve simply as a set of tools to assist the Board in gauging whether an employee's assigned activities properly fall within the scope of the law enforcement duties recognized by and contained within the statutory ambit of the Act. *Bingaman*, 127 F.3d at 1436. Thus, the *Bingaman* considerations reflect and do not replace the language of the statute itself. Application of the *Bingaman* considerations by the Board to the facts of a particular case suggests not a disregard of the statute but a proper and thorough consideration of facts relevant to a determination of statutory coverage.

This court thoroughly considered the statutory language and legislative history in *Bingaman*. *Id*. at 1436 (setting forth the genesis and relevance of the *Bingaman* factors). Based on that thorough review, this court held that the statutory term "law enforcement officer" should be strictly construed, and that the legislative history of the statute indicates that it was enacted to ensure that the covered LEO positions "should be composed, insofar as possible, of young men and women physically capable of meeting the vigorous demands of occupations which are far more taxing physically than most in the Federal

Service." *Bingaman*, 127 F.3d at 1435 (quoting S. Rep. No. 93–948, at 2 (1974), *reprinted in* 1974 U.S.C.C.A.N. 3698, 3699).

From these two considerations, this court in *Bingaman* determined that the statutory term "law enforcement officer" should be limited to "those law enforcement personnel who are most immediately involved in the process of criminal investigation and arrest." *Id*. at 1436; *see also Hannon*, 234 F.3d at 677, 680. To determine whether a particular employee is "most immediately involved in the process of criminal investigation and arrest," the court reiterated the Board's formulation of the following factors: (1) has frequent direct contact with criminal suspects; (2) is authorized to carry a firearm; (3) interrogates witnesses and suspects, giving *Miranda* warnings when appropriate; (4) works for long periods without a break; (5) is on-call twenty four hours a day; and (6) is required to maintain a level of physical fitness. *Bingaman*, 127 F.3d at 1436.

 These factors were not set forth as a substitute for the statute, but rather as a framework for the factual inquiry needed to ascertain coverage under the statutory scheme. The *Bingaman* factors are thus considerations that bear on the question of whether an employee qualifies for LEO retirement credit. Although no single factor is essential or dispositive, we stated in *Bingaman* that these considerations "capture[ ] the essence of what Congress intended" in enacting 5 U.S.C. § 8331. *Bingaman*, 127 F.3d at 1436. In other words, the *Bingaman* considerations are relevant to determining whether an employee is a law enforcement officer because they are relevant to determining whether an employee's duties are primarily criminal investigation, apprehension, or detention. *See Hannon*, 234 F.3d at 677–79. It bears repeating that no single fac-

tor is essential or dispositive. *Bingaman,* 127 F.3d at 1436. In addition, the list of considerations set forth in *Bingaman* is by no means an exhaustive or exclusive list of the considerations that bear on whether an employee qualifies for LEO service credit under the statute. *Id.*

### Application of the *Bingaman* Considerations

■ Regarding the first *Bingaman* consideration, frequent direct contact with criminal suspects, Hall testified that he had frequent direct contact with criminal suspects because the people working at the seaport have criminal records, and there is organized crime and other criminal activity there. However, Hall testified that he has no direct knowledge of organized crime at the seaport. In addition, Hall did not allege that the organized crime and other criminal activity at the seaport is something that he investigates. Even if Hall had frequent direct contact with individuals who may have criminal records, this is not the frequent direct contact with criminal *suspects* referred to in the *Bingaman* considerations. The statute, as reflected in the *Bingaman* considerations, requires investigation of criminals or individuals suspected of having committed a criminal act. In Hall's case, whatever direct contact he may have had with criminal suspects was incidental to his primary duties of employing his "active response" detector dog to detect narcotics.

Regarding the second and third *Bingaman* considerations, authorization to carry a firearm and interrogation of criminal suspects, the Board found that Hall is authorized to carry a firearm while performing his CEO duties and while driving to and from work. However, in the time period considered by the Board, Hall had not given any *Miranda* warnings and had only questioned one individual that he

spotted in a restricted area without proper identification.

Regarding the fourth and fifth *Bingaman* considerations, working for long periods without a break and being on-call, Hall testified that he frequently works overtime and has been called out at 1:00 am, 2:00 am, and 3:00 am to work overtime. Hall is called in for overtime because he is on an overtime list, but testified that he does not know whether he can take himself off the list. Hall's supervisor testified that CEOs are not required to stay in a "readiness mode." Hall's supervisor also testified that Hall is not in a paid status for twenty-four hours a day and that Hall must technically be in such a paid status to be on call. However, Hall's supervisor admitted that he can call someone in for overtime at any time.

The Board found that while Hall is allowed to plan days off in advance, his scheduled day off may be cancelled if no one else is available to work. Hall testified that on several occasions his scheduled day off has been cancelled. The Board considered all of this testimony and further noted that because Hall's detector dog is limited to working sixteen hours per day, Hall does not work more than sixteen hours per day. The Board also found that even if Hall works long hours, he does not do so without taking breaks.

Regarding the sixth *Bingaman* consideration, being required to maintain a level of physical fitness, Hall argues that although he is not formally required to maintain a specified level of physical fitness as a condition of employment, his position informally requires him to remain physically fit because it involves strenuous activity. Hall had to pass an initial physical before qualifying as a CEO. Hall points out that the CEO position description states that incumbents must be able to work out-of-doors under all types of condi-

tions and will encounter physical demands such as running over rough surfaces, climbing heights, driving for extended periods of time, and heavy lifting, pushing, stooping, crouching, crawling, and reaching. The position description also states that a CEO may be required to defend himself against attack by hostile suspects, and warns that the work environment includes high risks and possible dangerous situations.

Hall further points out that his primary investigative tool, his detector dog, weighs approximately ninety pounds. Hall alleges that he must lift the dog repeatedly to investigate warehouses, aircraft, vessels, and other cargo containers. He at times must hoist his dog using a rope tied to a bag that cradles the dog. Hall also alleges that he must lift and move freight, climb to reach stacked cargo containers, crawl through various cargo containers, and hoist himself into bellies of aircraft. The Board considered the fitness requirements of Hall's position along with the other *Bingaman* considerations in making an overall determination of whether Hall is the type of law enforcement person who is most immediately involved in the process of criminal investigation and arrest, and whether his position includes vigorous demands that are far more taxing physically than most in the Federal Service.

Upon reviewing the Board's analysis of the *Bingaman* considerations, we discern no abuse of discretion in this portion of the Board's decision.

### Physical Demands and Hazard

Hall next argues that the Board failed to properly consider the physically demanding nature of his duties. In its decision, the Board acknowledged Hall's testimony that his position involved "strenuous" activity. Just because the Board did not give a detailed list of the strenuous

activities included in Hall's duties does not lead us to conclude that the Board failed to properly consider the physically demanding nature of Hall's duties.

Hall also argues that the Board failed to properly consider the hazardous nature of his duties. In *Hannon*, this court noted that the Board has consistently recognized that hazard is a significant element of law enforcement work, 234 F.3d at 679 (*citing Ferrier*, 66 M.S.P.R. at 244; *Peek*, 63 M.S.P.R. at 434; and *Sauser*, 59 M.S.P.R. at 492), and that nothing in the legislative history of the relevant statutory provisions suggests that Congress intended to prohibit consideration of hazard in determining law enforcement officer status. *Id.* at 680.

Hall bases his argument on the fact that the Board never mentioned the voluminous record evidence concerning the hazards to which Hall is exposed. Hall alleges that his work at the seaport includes life-threatening searches of cargo holds and containers. He also alleges that he is exposed to danger of physical attack from stowaways, armed crew members, and longshoremen with whom he comes into contact, as well as from narcotics smugglers. Hall carries narcotics in his van, to be used as training aids, thereby exposing himself to the risk of attack.

In *Hobbs*, the Board acknowledged that the existence and degree of hazard may not itself be an appropriate factor to consider in determining LEO status, but that it may be relevant insofar as *physical stamina* and *vigor* are necessary to overcome the hazards inherent in *frontline* LEO duties. 58 M.S.P.R. at 633. We agree with the Board's analysis in *Hobbs* that the relevance of hazard to a LEO analysis is that physical stamina and vigor are necessary to overcome such hazards.

Hall likens the alleged hazards inherent in his duties to those set forth in *Taylor v. Department of the Treasury*, 68 M.S.P.R. 693 (1995). In *Taylor*, the Board initially found that Taylor primarily investigated criminal suspects. *Id.* at 696. In addition, the Board found that Taylor's duties were hazardous because they required rendering explosive and incendiary devices safe. *Id.* at 697. The Board stated that "the criminal aspect of his contact with explosives adds to the inherent dangers of working with explosives." *Id.* at 698. The Board therefore found that the hazardous nature of Taylor's duties entitled him to LEO service credit.

Based on the evidence presented by Hall regarding the allegedly hazardous nature of his duties, we hold that even if the Board in *Taylor* had correctly applied the proper interpretation of "hazard" as set forth in prior case law, Hall's duties do not present the same level of hazard present in the facts of *Taylor*. Hall's duties as a CEO are significantly less dangerous than rendering explosive and incendiary devices safe.

### 5 C.F.R. § 831.902

■ In addition to the foregoing, Hall argues that the Board erred in *relying upon* 5 C.F.R. § 831.902 to deny each of his requests for LEO service credit. The statutory definition of "law enforcement officer" is set forth in 5 U.S.C. § 8331(20) as "an employee, the duties of whose position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States...." Section 831.902 further defines "law enforcement officer" to exclude employees whose duties involve "maintaining order, protecting life and property, guarding against or inspecting for violations of law, or investigating persons other than per-

sons who are suspected or convicted of offenses against the criminal laws of the United States." The initial decision holds: "Considering the record as a whole, I find that the appellant's primary duties are more in the nature of 'protecting life and property, guarding against or inspecting for violations of law, or investigating persons other than persons who are suspected or convicted of offenses against the criminal laws of the United States.' "

Hall appears to be arguing that the Board erroneously viewed 5 U.S.C. § 8331(20) and 5 C.F.R. § 831.902 as an either/or proposition. According to Hall, the Board's decision in *Ferrier* makes clear that section 831.902 may not be read to deny LEO status to employees who meet the statutory definition of a LEO, even though their duties may also be cast as the type excluded from coverage by section 831.902. That is, 5 U.S.C. § 8331(20) and 5 C.F.R. § 831.902 should not be read as an either/or proposition.

In *Ferrier*, the Board stated:

We have not disregarded [5 C.F.R. § 831.902]. Rather, we read [5 U.S.C. § 8331(20)] and [section 831.902] *in pari materia*. We find that the appellant has demonstrated that he meets the statutory LEO definition. Because [section 831.902] repeats the statutory LEO definition, the appellant meets the regulatory definition as well. The language of the regulation excluding an employee whose primary duties "involve maintaining law and order, [and] protecting life and property" cannot be read to exclude from LEO coverage an employee like the appellant whose primary duties are the "investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States," even though

those duties could also be cast as maintaining law and order.

*Ferrier,* 66 M.S.P.R. at 250.

Upon reviewing the Board's decision, we cannot say that the Board erroneously applied 5 U.S.C. § 8331(20) and 5 C.F.R. § 831.902 as an either/or proposition. The Board stated that Hall's duties are *"more in the nature of* 'protecting life and property, guarding against or inspecting for violations of law, or investigating persons other than persons who are suspected or convicted of offenses against the criminal laws of the United States.' " (emphasis added). The Board so-stated after a thorough analysis of the *Bingaman* factors and its determination that once Hall finds narcotics, a function that the Board found to be primarily an inspection, the Office of Investigations is notified to investigate, apprehend, give *Miranda* warnings to and interrogate the criminal suspect. Nowhere does the Board state that because Hall primarily guards against or inspects for violations of law, he cannot therefore primarily investigate, apprehend, or detain criminal suspects.

▬▬▬ As we stated in *Hannon,* the evaluation of and weight to be given to the various *Bingaman* considerations and the other evidence in the record are judgment calls that rest primarily within the discretion of the Board. *Hannon,* 234 F.3d at 681. Here the Board, based upon a consideration of all of the relevant factors, concluded that Hall had not established law enforcement officer status. Since the Board considered all of the relevant factors, it is not our function to substitute our judgment for that of the agency regarding the weight to be given to those considerations. Weighing of such evidence is for the fact-finder, not the reviewing court. *Id.* We hold that the Board did not abuse its discretion in determining that Hall was not entitled to LEO service credit.

### 5 C.F.R. § 831.906(e)

▬▬▬ In a Memorandum of Prehearing Conference and Rulings dated October 2, 1998, the administrative judge limited the time period at issue in this appeal to December 22, 1993 through December 21, 1997. Although not set forth in the Memorandum, the administrative judge based this time limitation on 5 C.F.R. § 831.906(e), which states:

Coverage in a position or credit for past service will not be granted for a period greater than 1 year prior to the date that the request from an individual is received by . . . the employing agency, the agency where past service was performed, or OPM.

Hall makes two arguments against the imposition of such a time limitation. First, he argues that section 831.906(e) is invalid because: (1) it is contrary to the statutory provisions of the CSRS;[2] or (2) it is arbitrary and unreasonable. Second, Hall argues that even if section 831.906(e) is valid, Treasury waived the restriction when it issued a decision on the merits of his requests for LEO coverage for the CEO position[3] and his requests for LEO service credit for his own position as a CEO.

---

2. Specifically, Hall alleges that this regulatory time bar is contrary to 5 U.S.C. § 8336(c)(1) and 5 U.S.C. § 8332. Section 8336(c)(1) states, "[a]n employee who is separated from the service after becoming 50 years of age and completing 20 years of service as a law enforcement officer . . . is entitled to an annuity." Section 8332 states in relevant part,

"[t]he service of an employee shall be credited from the date of original employment to the date of separation on which title to annuity is based in the civilian service of the Government."

3. Hall does not appeal Treasury's denial of LEO coverage for the CEO position. Instead,

We first consider Hall's waiver argument because it is dispositive on this issue. In its denial of Hall's requests for service credit, Treasury noted that his requests for LEO coverage for the CEO position were untimely. However, with respect to his requests for LEO service credit for his own position as a CEO, Treasury considered Hall's service as a CEO beginning in 1979. Treasury did not limit its analysis to the time period between December 22, 1993 and December 21, 1997.

In support of his argument that Treasury waived its right to enforce the time limitation of 5 C.F.R. § 831.906(e), Hall cites *Trivett v. Department of the Navy*, 83 M.S.P.R. 61 (1999). In *Trivett*, the Board held that 5 C.F.R. § 842.804(c), imposing a similar time limit on employees seeking LEO service credit through the Federal Early Retirement System, "is not a substantive condition of eligibility for LEO coverage mandated by statute, but instead is a procedural, 'regulatory time limit.'" *Id.* at 63. As such, the Board held that the time limit was waived if not enforced at the employing agency level. *Id.*

The government argues that the time limitation of section 831.906(e) was not waived by Treasury because "[w]hile it is not clear that the agency excluded any of Mr. Hall's service or limited [its] review to any particular date period, it is clearly stated that the agency 'examine[d] his request under 5 C.F.R. § 831.906' which specifically incorporates the time limitation." In fact, the government alleges that the agency "did a reasoned analysis of the time limits contained in § 831.906[sic] to determine whether Mr. Hall's request for position coverage was untimely." We are not persuaded by this argument, because Treasury only applied section 831.906 in its denial of LEO service credit for the CEO

position, not in its denial of LEO service credit for Hall's own position as a CEO.

Other cases that, like *Trivett*, are persuasive but not precedent for this court, have held that an agency waives its timeliness defense when it decides the merits of a complaint without addressing the question of timeliness. *Ester v. Principi*, 250 F.3d 1068, 1071–72 (7th Cir.2001); *see also Bowden v. United States*, 106 F.3d 433, 438–39 (D.C.Cir.1997) (holding that when agency decides a case on the merits without mentioning timeliness, its failure to raise the issue of timeliness in the administrative process may lead to waiver of a timeliness defense); *Smith v. Danzig*, No. Civ. 00–216–PH, 2001 WL 823642 (D.Me. July 20, 2001) (quoting *Ester* and *Bowden*, and holding that a timeliness defense was waived by the Navy when the Navy issued a final decision on the merits without so much as alluding to the statute of limitations). In *Ester*, the Seventh Circuit based its waiver holding on the policy of judicial economy. 250 F.3d at 1072.

In this case, we choose to follow the guidance of the Seventh Circuit. We hold that Treasury waived its timeliness defense under section 831.906(e). Treasury's denial of Hall's requests for LEO service credit was decided on the merits. Treasury considered Hall's service as a CEO beginning in 1979. Although Treasury mentioned section 831.906 in its denial of Hall's request for coverage for the CEO position, it never mentioned section 831.906 in its denial of Hall's requests for LEO service credit for his own position as a CEO.

## CONCLUSION

Because the Board's factual determinations are supported by substantial evidence and its legal conclusions are not

Hall appeals Treasury's denial of LEO service credit for his own duties as a CEO.

arbitrary, capricious, or an abuse of discretion, and are otherwise in accordance with law, we affirm the Board's denial of service credit for the period at issue in this appeal. However, because Treasury waived its right to request limitation of the time period for which the Board may review Hall's entitlement to service credit, we hold that the Board erred in restricting the time period at issue in Hall's appeal. Thus, we reverse that portion of the decision and remand for a determination of whether Hall's previous duties qualify for the service credit he requests.

*AFFIRMED–IN–PART, REVERSED–IN–PART,* and *REMANDED*