Roberto A. LABRADA, Petitioner,

v.

**DEPARTMENT OF THE TREASURY,**
Respondent.

No. 00–3394.

United States Court of Appeals,
Federal Circuit.

Oct. 1, 2001.

Before NEWMAN, RADER, and LINN, Circuit Judges.

LINN, Circuit Judge.

Roberto A. Labrada appeals the decision of the Merit Systems Protection Board ("Board"), affirming the decision of the Department of the Treasury ("Treasury") that his service as a Customs Inspector does not entitle him to "law enforcement officer" retirement credit under the Civil Service Retirement System ("CSRS"). *Labrada v. Dep't of the Treasury*, No. SF–0831–98–0621–I–4 (M.S.P.B. June 12, 2000). Because the Board's denial of LEO service credit for the period at issue in this appeal is not arbitrary, capricious, or an abuse of discretion, and is otherwise in accordance with law, we *affirm* the Board's denial of service credit for the period at issue in this appeal. However, because Treasury waived its timeliness defense with respect to Labrada's request for LEO credit based on his individual duties, we hold that the Board erred in restricting the time period at issue in Labrada's appeal. Thus, we *reverse* that portion of the decision and *remand* for a determination of whether Labrada's previous duties qualify for the service credit he requests.

## BACKGROUND

Labrada became employed as a Customs Inspector, GS–1890–5, in Calexico, California, effective September 25, 1983. Each year, there are approximately one thousand narcotics seizures made at Calexico. At that time, Labrada knew that his position was not subject to LEO service credit for CSRS retirement purposes. Sometime in 1993 or 1994, Labrada's union official informed him that he could make an application for LEO service credit. Labrada testified that, up until that time, he did not know that he could apply for LEO service credit. On July 20, 1994, Labrada completed an application for LEO service credit. His union submitted his application, along with several others, on December 22, 1994.

In October 1983, Labrada spent seven and one-half weeks at the United States Customs Academy. He was required to pass a medical examination and was advised of certain medical standards he must maintain. However, he does not need to pass a yearly medical examination. At the Academy, Labrada received training in arrest authority and procedures, search and seizure, Customs and Constitutional law, frisking and pat-down techniques, handcuffing and take-down techniques, passenger and cargo processing, identification of violators, and the use of sidearms and shotguns. Labrada carries a firearm while on duty. In addition to working at the Mexican border in Calexico, California, Labrada has also worked at the Canadian National Airport in Montreal, Quebec, at the Canadian Border in Blaine, Washington, and at the Mexican border in San Luis, Arizona.

The Board considered Labrada's position descriptions in detail. As a GS–09 Customs Inspector, Labrada's position description identified his primary function as processing passengers and cargo using current selectivity techniques to distinguish potential violations and to concen-

trate on them while facilitating legitimate arrivals.

With regard to passenger processing, a GS–09 is required to quickly identify subjects for additional attention. If warranted, the Inspector may apprehend, search, detain, and arrest violators of the civil and criminal laws of the United States, requiring skill in defensive techniques, including firearms proficiency.

With regard to cargo processing, a GS–09 Customs Inspector is involved with inspection and control of cargo, conveyances, and facilities, to efficiently release goods that meet all applicable criteria, and to detect inadvertent or willful non-compliance. In order to enforce compliance, the Inspector may deny a permit for carriers to discharge their cargo, retain custody of the cargo, or hold the cargo for examination by other agencies.

The position description for a GS–09 describes the Inspector's personal contacts as varied, including government employees, employees and officials of carriers, brokers, importers and their representatives, warehouse proprietors, laborers, and the traveling public. One purpose of this contact is to enforce customs laws in carrying out inspection processes in the admission and release of baggage, cargo, and informal entries. The position description specifically states that the contacts may become hostile when violations of customs laws are discovered.

The position description for a GS–11 Senior Customs Inspector provides for advisory and coordinating duties, and specialized assignments involving highly sensitive inspection and control issues. A GS–11 Senior Customs Inspector performs, for at least a majority of the time: (1) on a special enforcement team; (2) in specialized manifest review and document analysis; (3) at a centralized cargo examination station; or (4) in airport security. Labra-

da testified that since his promotion in 1997, he has been performing exclusively cargo duties at the Calexico, California point of entry ("POE"). Therefore, the Board found that Labrada performs some, but not all, of the duties listed in the standard position description for a Senior Customs Inspector. The duties related to cargo processing, as listed in the standard position description, are as follows:

(1) performs a variety of analytical/targeting and examination functions for cargo; (2) reviews documents of incoming shipments and queries databases for information on the shipper, broker, importer, or shipment; (3) applies selectivity criteria and assesses risk using available intelligence data, and establishes the extent of inspection required in given circumstances; (4) designates the appropriate level of inspection for other inspectors at his station, or oversees the inspection personally; (5) monitors inspection and control activities and performs a variety of administrative, advisory, and coordination tasks including providing daily assignments, approving overtime, training and leave requests, balancing workload; (6) determines the necessity of pat-down searches, and, if warranted, detains individuals and makes arrests; (7) reviews and evaluates carriers', importers', and exporters' records; (8) plans necessary actions, provides assignments to team members, and carries out needed actions; (9) writes reports and indicates corrections to be made or penalties that are appropriate; and (10) conducts inspectional audits, spot checks, and inventories in a variety of situations to assure documentation is consistent with reported transactions and that all customs procedures and requirements are met.

Although the Senior Customs Inspector position description provides that some incumbents serve on special inspectional or

investigative teams, the Board found that Labrada's duties have never been primarily such specialized duties. The Board then considered Labrada's actual duties in each position in detail.

At the Blaine, Washington POE, the weather is pleasant in the summer and icy cold in the winter. This POE has been designated a High Intensity Drug Trafficking Area by the United States government, averaging about 600 seizures per year. Employees rotate every two weeks between passenger processing and cargo processing. Employees also rotate between the day, night, and midnight shifts. Passenger processing takes place in a primary inspection booth, where Labrada generally worked alone. Labrada also worked in the "pre-primary" area of vehicle lanes located around the primary inspection booth.

At Blaine, Labrada entered license plate information from vehicles located in the pre-primary area to find out whether there is a state warrant, "armed and dangerous" alert, or "be on the lookout" for that vehicle. At the primary inspection booth, Labrada took customs declarations and reviewed immigration documents, border crossing cards, resident alien cards, and proof of citizenship. At this time, Labrada may have referred the vehicle to a "secondary" area for a search. The Blaine POE has an "honest traveler" policy, allowing individuals referred to the secondary area to walk freely from their vehicles to the waiting area.

Labrada has drawn his weapon during "armed and dangerous" alerts. On one occasion, he drew his weapon on a couple who were running the port. He testified that, as the car sped from the secondary area, it almost ran him down. However, Customs Inspectors are not authorized to engage in hot pursuit of port-runners. Inspectors treat the POE limits like a state line. They must rely on local police or highway patrol once a suspect proceeds out of the POE.

Labrada testified that he was involved with several arrests while working at Blaine. However, he could not recall the exact number of arrests. Documentary evidence showed that Labrada initiated several arrests based on state and other warrants while working at Blaine. By initiating an arrest, Labrada took the name and identification of the individual and entered it into a computer. If the computer showed that the person was wanted, Labrada contacted either the State police or the Office of Investigation, as appropriate. Labrada had only one significant seizure at Blaine that resulted in an arrest. In that seizure, Labrada could not recall being involved in the arrest. The Board noted that arrest guidelines at the Calexico, California POE state that arrest authority is generally reserved for Special Agents, and that the guidelines at Blaine were substantially the same. The Board therefore found that Labrada's arrest authority is limited to making a citizen's arrest for some state violations.

At the San Luis, Arizona POE, Labrada's duties were similar to those at other locations. However, Labrada testified that his shifts were more difficult and he spent more time in passenger and pedestrian processing. At San Luis, Customs Inspectors rotate through day (8:00 am—4:00 pm), night (4:00 pm—12:00 am), and midnight (12:00 am—8:00 am) shifts every two weeks. Labrada testified that it was physically difficult for him to adjust to the shift changes. Rather than working fifty percent of his time in cargo processing, Labrada testified that he worked primarily in passenger processing.

Labrada testified that he was involved in several scuffles and a foot chase within the San Luis POE. Labrada was the seizing

officer in three large marijuana finds. However, the arresting officer in each case was a Special Agent, not Labrada.

At the Calexico, California POE, the temperature in the summer reaches 120 degrees. Therefore, Customs Inspectors must deal with vehicle problems such as overheating radiators and car fires, and must work on hot asphalt around vehicle exhaust fumes.

During his first year at Calexico, before he was promoted to a Senior Customs Inspector, Labrada was assigned full-time to passenger processing. Labrada testified that he spent a total of four hours out of an eight-hour shift in the primary booth. He spent the other four hours between pedestrian processing and the vehicle secondary area. Labrada also performed roving duties with a Canine Enforcement Officer ("CEO") through traffic lanes located before the primary booths. While roving, the CEO's dog may alert on a vehicle or the officers may find the vehicle suspicious.

As a Customs Inspector, Labrada only needs a "mere suspicion" that a crime has been committed in order to pat down or detain an individual for a more intensive search. Labrada testified that he conducts a behavioral analysis on each individual coming through his booth or the pedestrian walkways. Based on this analysis, Labrada may decide to refer the person/vehicle to secondary inspection. In secondary inspection, Labrada completes a referral slip with comments on his suspicions. Although vehicles generally proceed to the secondary area without an escort, suspicion of a more substantial violation merits a "walk-off," in which several Customs Inspectors surround the vehicle and escort it to the secondary area. In circumstances where the vehicles have been identified as "be on the lookout" or "armed and dangerous," the Customs In-

spectors may choose to remove the individuals from the vehicle, conduct a frisk or pat-down, handcuff the individuals, and escort them to the search room or a holding cell. Labrada testified that he performs at least one walk-off each day.

If narcotics or illegal contraband are discovered during the search, the Customs Inspector tests a portion of the narcotics without removing them from the vehicle. If the test is positive, Labrada completes an Incident Report and notifies the Office of Investigations to send a Special Agent to the scene. The Special Agent instructs Labrada whether the narcotics may be removed from the vehicle and how photographs should be taken. The Board found that the Special Agent is responsible for conducting the criminal investigation, giving *Miranda* warnings, interrogating suspects and witnesses, making the arrest, and transporting the prisoner. Customs Inspectors may not interrogate detainees and can only hold them until the Special Agent or local police decide whether they will arrest the detainee.

At Calexico, Labrada participated in at least 15 seizures of marijuana and cocaine, most of which resulted in arrests by the Office of Investigations. The Board found no dispute that Labrada's job is dangerous. In fact, in April 1997, a detainee fired on Labrada. He survived shots to the upper chest and the arm. In addition, Labrada received threats from the family of the detainee, causing Treasury to provide twenty-four hour security for Labrada.

Upon his recuperation and return to work, Labrada was promoted to a Senior Customs Inspector, and took on full-time duties in cargo processing. There is no overnight shift in cargo processing, and Labrada receives breaks and is not on-call. Labrada therefore spends one half of his day in the primary booths, and the other

half of his day split between inspecting trucks in the secondary area and in the office processing paperwork. He has made no narcotics finds since moving full-time to cargo processing. However, Labrada participated in at least one Brass Ring Enforcement Team operation in June 1998, resulting in the seizure of 248.75 pounds of marijuana.

Based on these facts, the Board held that Labrada was not eligible for LEO service credit because he does not primarily investigate, apprehend, or detain criminal suspects. Labrada appeals the Board's denial of LEO service credit to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9) (1994).

## DISCUSSION

### Standard of Review

This court must affirm an MSPB decision unless it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c)(1)-(3) (1994); *Hayes v. Dep't of the Navy*, 727 F.2d 1535, 1537 (Fed.Cir. 1984). The burden of establishing reversible error in the Board's decision rests upon Labrada. *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed.Cir. 1998).

### Analysis

#### I

■ Labrada seeks LEO retirement credit under CSRS. 5 U.S.C. § 8336(c)(1) (1994); 5 U.S.C. § 8331(20) (1994). Labrada argues that he "investigates" and "apprehends" criminal suspects as required under the CSRS LEO retirement statutes. Labrada also contends that his duties are analogous to *Sauser v. Office of*

*Personnel Management*, 59 M.S.P.R. 489 (1993), in which the Board determined that the appellant was entitled to LEO service credit. Thus, he alleges that the Board's determination that he was not entitled to LEO service credit for his duties as a Customs Inspector was based on a misapplication of statutory and regulatory standards and Board precedent and, therefore, was arbitrary, capricious, and contrary to law.

The relevant CSRS LEO retirement statute states:

> An employee who is separated from the service after becoming 50 years of age and completing 20 years of service as a law enforcement officer . . . is entitled to an annuity.

5 U.S.C. § 8336(c)(1) (1994). "Law enforcement officer" is statutorily defined as:

> an employee, the duties of whose position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States.

5 U.S.C. § 8331(20) (1994).

The "primary duties" of a position are those that "[a]re paramount in influence or weight; that is, constitute the basic reasons for the existence of the position; [o]ccupy a substantial portion of the individual's working time over a typical work cycle; and [a]re assigned on a regular and recurring basis." 5 C.F.R. § 831.902(1) (2000).

In *Hall v. Dep't of Treasury*, 264 F.3d 1050 (Fed.Cir.2001), we extensively discussed the meaning of the words "investigation" and "apprehension" in 5 U.S.C. § 8331(20), noting that an LEO as defined by CSRS commonly: (1) has frequent direct contact with criminal suspects; (2) is authorized to carry a firearm; (3) interrogates witnesses and suspects, giving *Miranda* warnings when appropriate; (4)

works for long periods without a break; (5) is on call 24 hours a day; and (6) is required to maintain a level of physical fitness. *Hall,* at 1055–56, citing *Bingaman v. Dep't of the Treasury,* 127 F.3d 1431, 1436 (Fed.Cir.1997). As noted in *Hall,* these factors are derived from the Board's construction of "investigation" and "apprehension" of criminal suspects to include only those law enforcement personnel who are most immediately involved in the process of criminal investigation and arrest. Consequently, these factors are considered in determining whether a particular employee investigates or apprehends criminal suspects. Certainly no single factor is essential or dispositive, but each factor bears on the question of whether a particular employee qualifies as a "law enforcement officer" for purposes of entitlement to LEO retirement credit. *Hall,* at 1055.

Based on the facts presented at the hearing, the Board found that Labrada performs no investigative work beyond questioning mostly law abiding citizens at the border, taking declarations, checking license plates to see whether a vehicle is "wanted," producing reports upon discovery of narcotics, and testifying in criminal cases. The Board found that these duties were not investigatory and did not take up more than fifty percent of Labrada's time.

Regarding apprehension of criminal suspects, the Board found that Labrada presented no evidence that he actually apprehends criminal suspects in front-line LEO-type situations because he cannot pursue criminal suspects off the POE site. The Board also found that Labrada does not have frequent direct contact with criminal suspects, but rather with the traveling public. The Board also found that even when Labrada considers members of the traveling public to be acting suspiciously, they do not become criminal suspects. In fact, most people who are patted down and most vehicles referred for search are not found to be in violation of any laws. The Board found that although Labrada may observe and question travelers, make systematic inquiries, and may have a suspicion that an illegal substance is located in a vehicle, this mere suspicion does not rise to the level of probable cause that a crime has been committed, nor does it usually form the basis for an arrest.

The Board thus found that the overwhelming evidence of record shows that Labrada's primary function is to inspect for violations of the Customs laws, and therefore that his duties are not primarily the investigation, apprehension, and detention of particular criminal suspects.

Regarding Labrada's analogy to *Sauser,* in *Sauser* the appellant sought LEO service credit under the CSRS for his positions as a Customs Inspector and a Customs Patrol Officer. *Id.* at 492. The Board sustained the administrative judge's determination that Sauser's service as a Customs Inspector and Patrol Officer were creditable, based on a finding that Sauser's area of operations as a Customs Inspector and Patrol Officer was characterized by an especially heavy flow of drug smuggling and the importation of other illegal contraband. *Id.* at 493. Therefore, the Board found, Sauser was regularly required to investigate and apprehend individuals suspected of violating the criminal laws of the United States. *Id.* at 493–94. The Board further found that Sauser engaged in surveillance and other intelligence-gathering activities specifically targeted at halting the criminal activities of suspected smugglers. *Id.* at 494. Sauser "frequently pursued and helped apprehend suspected criminals in situations involving great danger to himself and ... he was ... injured on a few of those occasions." *Id.* Sauser had completed advanced tactical firearms

instruction as part of his duties, and he was a member of a high risk Warrant Entry Tactical Team involving the use of special weapons and tactics. *Id.* Based on these aspects of Sauser's duties, the Board concluded that he was entitled to LEO service credit. *Id.*

Labrada's duties, however, fall short of the factual scenario of *Sauser.* Labrada failed to show that he "frequently pursued and helped apprehend suspected criminals," nor did he show that he "has completed advanced tactical firearms instruction, ... and [was] a member of a high-risk Warrant Entry Tactical Team involving the use of special weapons and tactics." *Id.* Thus, *Sauser* did not necessitate a conclusion by the Board that Labrada was entitled to LEO service credit, and the Board did not abuse its discretion in failing to so conclude. Thus, the Board did not fail to follow *Sauser,* because that case is distinguishable on its facts.

Because the Board applied the proper definition of the terms "investigation" and "apprehend" in analyzing Labrada's duties as a Customs Inspector, and because the Board did not misapply the law by failing to find that Labrada was entitled to LEO service credit under *Sauser,* we affirm the Board's determination that Labrada's duties are not primarily "the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States," as required by 5 U.S.C. § 8331(20).

Labrada also argues that the evidence of record shows that his duties were physically demanding and hazardous and therefore that he is entitled to LEO service credit under *Ferrier.* In *Ferrier,* the Board granted LEO service credit to a Fish and Wildlife Service police officer whose duties were commensurate with state and local police officers in the area surrounding the refuge. 66 M.S.P.R. at 244, 250. He in-

vestigated crimes, had authority to arrest, carried a firearm, had to respond to calls even when off-duty, and could be called upon to work long hours. *Id.* at 245. His duties could involve strenuous exertion and adverse weather conditions. *Id.* Ferrier investigated suspected criminal activity, and apprehended and detained suspects. *Id.* at 246. He engaged in a high-speed car chase and then pursued the suspect on foot and over a ten-foot wall, eventually apprehending and arresting him. *Id.* at 246–47. He was called from home one night to investigate a trespass and unauthorized firearm use, and he apprehended the individuals. He has restrained a drunk attacking him with a baseball bat. *Id.* at 247.

Labrada's duties fall short of those presented in *Ferrier.* Labrada did not show that he has ever responded to calls when off-duty, or that he has ever pursued a suspect via a high-speed chase, and he did not assert that his duties were commensurate with state and local police officers in the area surrounding the POEs where he worked. Thus, *Ferrier* does not necessitate a conclusion by the Board that Labrada was entitled to LEO service credit, and the Board did not abuse its discretion in failing to so conclude. Thus, the Board did not fail to follow *Ferrier,* because that case is distinguishable on its facts.

## II

Labrada also argues that the Board erred in relying on 5 C.F.R. § 831.902 to deny his request for LEO service credit. Labrada appears to be arguing that the Board erroneously viewed 5 U.S.C. § 8331(20) and 5 C.F.R. § 831.902 as an either/or proposition. We recently confirmed in *Hall* that the statute and the regulation are not to be read as an either/or proposition. Here, as in *Hall,* we find that the Board thoroughly considered

all of the relevant factors and determined that Labrada was not primarily engaged in LEO activities. We find no basis to conclude that the Board erroneously relied on 5 C.F.R. § 831.902 to deny Labrada's request for LEO service credit or abused its discretion in determining that Labrada was not entitled to LEO service credit under the statute.

### III

Labrada finally argues that 5 C.F.R. § 831.906(e), which was relied on by the Board to limit Labrada's retroactive LEO service credit and thereby limit the scope of his appeal, is invalid. Section 831.906(e) states:

> Coverage in a position or credit for past service will not be granted for a period greater than 1 year prior to the date that the request from an individual is received under paragraphs (b), (c), or (d) of this section by the employing agency, the agency where past service was performed, or OPM.

5 C.F.R. § 831.906(e) (2000).

Labrada alleges that this regulation is invalid because: (1) it is contrary to the plain text of the statutory provisions that comprise the CSRS; and (2) it is an arbitrary and unreasonable exercise of the Office of Personnel Management's ("OPM") regulatory authority. Labrada also argues that even if the regulation is valid, the Board erred when it failed to find that Treasury waived the one-year restriction on the scope of Labrada's request for LEO service credit.

We first consider Labrada's waiver argument because it is dispositive on this issue. In its denial of Labrada's requests for service credit, Treasury noted that his LEO request for position coverage was untimely. However, with respect to his request for LEO service credit based on his individual duties, Treasury failed to mention timeliness. Treasury also did not limit its analysis of Labrada's individual duties to a period beginning in December 1993.

The waiver issue was raised and addressed in *Hall.* In that case, we adopted the position of the Seventh Circuit in *Ester v. Principi,* 250 F.3d 1068, 1071–72 (7th Cir.2001) and held that an agency waives its timeliness defense when it decides the merits of a complaint without addressing the question of timeliness. *Hall,* at 1061.

In this case, Treasury's denial of Labrada's requests for LEO service credit based on his individual duties was decided on the merits. Treasury considered Labrada's service as a Customs Inspector beginning in 1983. Although Treasury applied section 831.906 to Labrada's request for position coverage and found the request untimely, Treasury did not mention section 831.906 in its denial of Labrada's request for LEO service credit based on his individual duties. We hold that Treasury waived its timeliness defense under section 831.906(e) with respect to Labrada's request for LEO service credit based on his individual duties. In light of our holding, we need not and do not address the validity of the regulation.

### CONCLUSION

Because the Board's decision to deny LEO service credit to Labrada for the time period at issue in this appeal is not arbitrary, capricious, or an abuse of discretion, and is otherwise in accordance with law, we affirm the Board's decision. However, because Treasury waived its timeliness defense with respect to Labrada's request for individual coverage, we hold that the Board erred in restricting the time period at issue in Labrada's appeal. Thus, we reverse that portion of the decision and remand for a determination of

whether Labrada's previous duties qualify for the service credit he requests.