**Anthony L. GRASSI, Petitioner,**

v.

**DEPARTMENT OF THE TREASURY, Respondent.**

**No. 00–3341.**

United States Court of Appeals, Federal Circuit.

DECIDED: Sept. 5, 2001.

Before GAJARSA, Circuit Judge, ARCHER, Senior Circuit Judge, and LINN, Circuit Judge.

LINN, Circuit Judge.

Anthony L. Grassi appeals the decision of the Merit Systems Protection Board ("Board"), affirming the decision of the Department of the Treasury ("Treasury") that his service as a Canine Enforcement Officer ("CEO") does not entitle him to "law enforcement officer" retirement credit under the Federal Early Retirement System ("FERS"). *Grassi v. Dep't of the Treasury,* No. SF–0842–98–0552–I–5 (M.S.P.B. Apr. 27, 2000). Because the Board's decision is not arbitrary, capricious, or an abuse of discretion, and is otherwise in accordance with the law, we *affirm.*

## BACKGROUND

Grassi is a CEO, GS–1801–11, Team Leader. He has served as a CEO since June 1991. He was promoted to the Team Leader position in December 1996. The parties acknowledge that Grassi performs the primary CEO duties listed in the CEO position description.

The CEO position description under which Grassi served from 1991 through 1996, states that the incumbent serves as an enforcement officer with responsibility to: (1) enforce laws governing the importation of merchandise; (2) interdict smuggled merchandise and contraband; (3) detect violations of customs laws and those of other federal agencies; and (4) arrest, if warranted, persons involved in the viola-tions. The major portion of a CEO's time is spent working with his or her dog in one of three work situations: (1) vehicle search; (2) cargo and baggage processing; and (3) mail processing. CEOs train their dogs and utilize their dogs and special detection equipment to interdict drugs and other prohibited substances.

Upon promotion to the position of CEO Team Leader in 1996, Grassi had the following responsibilities: (1) providing expert technical advice to team members; (2) coordinating day-to-day assignments, overtime, weekends, and holidays; (3) implementing and coordinating proficiency training needs; (4) planning and carrying out a variety of troubleshooting assignments involving delicate relationships and critical issues; and (5) functioning as a working officer using an assigned detector dog.

Grassi spends the majority of his time working at the San Ysidro point-of-entry ("POE"), a border entry between the United States and Mexico. The San Ysidro POE is the largest land border in the United States, consisting of 24 lanes of traffic entering the United States. The inspectors and CEOs at San Ysidro POE work nine-hour shifts. A maximum of about eight officers work each nine-hour shift.

During a typical day, Grassi's shift begins when he arrives at the kennel, picks up his dog, George, and transitions to his government vehicle. Grassi testified that he spends a significant amount of time training George to recognize narcotics. After picking up George, Grassi proceeds to the San Ysidro POE and checks with the previous shift to discover any unusual vehicles or circumstances. He then checks various computer databases and briefs to identify trends or profiles he should be searching for at his POE. Grassi then proceeds to the traffic lanes with George.

All CEOs are required to work in teams with a back-up officer. Usually a CEO and customs inspector, or two CEOs, work together through the lanes of traffic. Generally the teams roam through traffic in the pre-primary area. The "pre-primary area" is the area of traffic north of the physical boundary between the United States and Mexico, and south of the booth through which vehicles must pass before entering the United States. The pre-primary area holds approximately 250–300 cars.

The detector dog may alert on a vehicle, or the officers may find a suspicious vehicle. At that time, the CEO moves back with his detector dog and the back-up officer questions the occupants further and takes the vehicle keys. Based on the questioning, the occupants may be handcuffed, patted down, and detained in a holding cell, while the vehicle is moved to a secondary lot for an intensive internal and external examination and search.

If a search reveals narcotics, the team is responsible for testing a portion of the narcotics. The Office of Investigations is notified to send a Special Agent to the scene. Grassi testified that in routine cases, his team processes the vehicle, photographs it, and removes the narcotics before the Special Agent arrives. The Special Agent is responsible for giving *Miranda* warnings, interrogating suspects and witnesses, making the arrest, and transporting the prisoner to the local jail or the appropriate federal agency.

Grassi determines whether individuals with small amounts of "personal use" narcotics should be assessed a fine, rather than referred to a secondary lot. He testified that he has handcuffed individuals and performed pat-downs. On a few occasions, he has processed evidence.

Grassi testified that he spends fifty percent of his time performing back-up duties for other CEOs. Grassi asserts, however, that he does perform investigative duties involving targeting certain types of vehicles, reviewing intelligence databases, questioning individuals crossing the border, taking their declarations, and assessing their credibility.

Grassi also participates in call-outs as many as four times each week with the Brass Ring Enforcement Team. A state, local, or federal agency may request the call-out of a CEO (outside of the POE) to establish probable cause for a search warrant. In such cases, the other agents and officers secure and clear the building before the CEO and his dog enter. Grassi acknowledged that he has never participated in call-out activities such as breaking down a door or chasing criminal suspects, nor has he ever arrested any suspects during call-outs.

Beginning in 1992 or 1993, Treasury withdrew the teams' authority to engage in the hot pursuit of "port runners" or individuals who flee the POE after being targeted. Since that time, CEOs have not been authorized to pursue or apprehend suspected criminals off of the fixed POE site. The teams must rely on local police or highway patrol if a suspect is able to proceed past the primary booths of the POE.

Grassi testified that, as a CEO, he primarily uses his dog to perform vehicle searches. He performs fewer cargo and baggage searches and no mail processing searches. The Board found that Grassi performed the following CEO duties during the relevant time period: (1) enforcing customs laws and regulations for importations into the United States; (2) independently, or as a member of a team, searching vehicles, vessels, aircraft, and other conveyances at strategic points of entry into the United States; (3) monitoring da-

ily task related training and monthly training records of each assigned team to identify remedial training needs; (4) conducting training to correct handler and dog deficiencies; (5) assessing CEO team capabilities during biennial program evaluations; (6) reviewing and inputting canine statistics; (7) making seizures and initiating chains of custody for evidence; (8) apprehending and searching suspected smugglers; (9) appearing in court as an expert witness for the government; (10) examining vehicles and releasing them if no contraband is found; (11) making seizures, preparing required documentation, and notifying appropriate agencies when contraband is found; (12) evaluating a wide variety of information and observations in secondary inspection areas; (13) establishing facts and detaining evidence that is needed for further investigation, for assessing penalties, or for prosecution; (14) screening cartons, crates, packages, etc. and, upon obtaining an alert from his detector dog, opening and examining merchandise for the presence of narcotics and, if found, seizing the merchandise and narcotics, preparing a seizure report, and contacting the DEA; (15) conducting field tests of suspected narcotics and, if possible, seizing the package, parcel, vehicle, etc., and continuing with customs formalities; (16) participating in special temporary assignments to other federal, state, and local law enforcement agencies using dogs as tools in the detection of controlled substances to create probable cause; (17) conducting continual training of his detector dog to maintain a high level of proficiency; (18) adhering to safe canine handling procedures to ensure the safety of persons and property; (19) examining his dog daily to detect illness, disease, or injury; (20) receiving, maintaining accountability for, and providing security for various narcotic substances used to train his dog; and (21) qualifying and maintaining proficiency in use of his firearm.

With respect to the foregoing, the Board found "no doubt" that Grassi's job is dangerous. He works in extreme weather conditions; he works around automobile exhaust and carbon monoxide; cars have bumped him; and he wears a bullet-proof vest because, when detaining individuals in the pre-primary area, he may encounter uncooperative persons who are armed and dangerous. In the course of his duties, Grassi has drawn his weapon during "armed and dangerous" calls. He fired his weapon on one occasion when his dog alerted on a vehicle and it accelerated toward him trying to run the port.

Grassi acknowledged, however, that: (1) he has made no arrests since 1991; (2) he is not authorized to give *Miranda* warnings; and (3) his overtime is voluntary. The Board found that Grassi examined 1,861,613 vehicles between 1991 and 1998. He made 503 marijuana finds, six cocaine finds, and one heroin find. He worked a total of 1668 days and seized property valued at $1,033,250.00. However, the actual arrests were made by a Special Agent subsequent to Grassi's seizures. Thus, it is a Special Agent, not Grassi, who is responsible for conducting the criminal investigation of the seizure.

Grassi was required to pass a medical examination as a condition of his employment. He was advised upon employment of his required medical standards, e.g., he must be able to push, reach, stoop, kneel, crouch, crawl, and lift seventy-five pounds. He must be able to defend himself against attack and maintain proficiency with his firearm. However, the Board stated that there is no evidence that Grassi must maintain his medical certification or pass an annual physical.

The Board recognized that "[a]lthough the evidence shows that [Grassi] plays an

important role in [Customs'] drug interdiction effort, he [nevertheless] has no investigative duties, does not give *Miranda* warnings, is not on-call, and does not make arrests." Thus, the Board concluded that Grassi "has not shown that the duties of his position are so rigorous that employment opportunities should be limited to vigorous individuals." The Board further concluded that Grassi's duties were not primarily the investigation, apprehension, or detention of criminal suspects, and therefore held that he is not entitled to LEO service credit for retirement under FERS. Grassi appeals the Board's denial of LEO service credit to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9) (1994).

## DISCUSSION

### Standard of Review

This court must affirm an MSPB decision unless it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c)(1)-(3) (1994); *Hayes v. Dep't of the Navy*, 727 F.2d 1535, 1537 (Fed.Cir. 1984). The burden of establishing reversible error in the Board's decision rests upon Grassi. *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed.Cir. 1998).

### Analysis

#### I

Grassi seeks LEO retirement credit under FERS. 5 U.S.C. § 8412(d)(2) (1994); 5 U.S.C. § 8401(17) (1994). Grassi argues that he "investigates" and "apprehends" criminal suspects as required under the FERS LEO retirement statutes. Grassi also contends that his duties are analogous

to *Sauser v. Office of Personnel Management*, 59 M.S.P.R. 489 (1993), and *Ferrier v. Office of Personnel Management*, 66 M.S.P.R. 241 (1995), two cases in which the Board determined that appellants were entitled to LEO service credit. Thus, he alleges that the Board's determination that he was not entitled to LEO service credit for his duties as a CEO was based on a misapplication of statutory and regulatory standards and Board precedent and, therefore, was arbitrary, capricious, and contrary to law.

The relevant FERS LEO retirement statute states:

An employee who is separated from the service, except by removal for cause on charges of misconduct or delinquency, after becoming 50 years of age and completing 20 years of service as a law enforcement officer . . . is entitled to an annuity.

5 U.S.C. § 8412(d)(2) (1994). "Law enforcement officer" is statutorily defined as follows:

"law enforcement officer" means—

(A) an employee, the duties of whose position—

(i) are primarily—

(I) the *investigation, apprehension, or detention* of individuals suspected or convicted of offenses against the criminal laws of the United States, or

(II) the protection of officials of the United States against threats to personal safety; and

(ii) are sufficiently rigorous that employment opportunities should be limited to young and physically vigorous individuals, as determined by the Director considering the recommendations of the employing agency . . . .

5 U.S.C. § 8410(17) (1994) (emphasis added).

The Board has previously interpreted the word "investigate" in *Hobbs v. Office of Personnel Management*, 58 M.S.P.R. 628 (1993), and *Ferrier*. While both *Hobbs* and *Ferrier* deal with LEO service credit under the Civil Service Retirement System ("CSRS"), and not FERS, the definition of "investigate" set forth in these cases is informative for an analysis of LEO service credit under FERS in light of the parallels between the statutory schemes of LEO service credit entitlement under CSRS and FERS. *See Bingaman v. Dep't of the Treasury*, 127 F.3d 1431, 1436 (Fed.Cir.1997). In *Hobbs*, the Board adopted the dictionary definition of "investigate," noting that "Webster's Ninth New Collegiate Dictionary 636 (1990) defines 'investigate' as: 'to observe or study by close examination and systematic inquiry' or 'to make a systematic examination; esp[.] to conduct an official inquiry.'" 58 M.S.P.R. at 632 n. 2.

In *Ferrier*, the Board stated that "investigation in section 8331(20) refers to criminal investigation .... Factors that distinguish criminal investigation from noncriminal investigation include unusual physical hazards for the investigator arising from frequent contacts with criminals and suspected criminals, working for long periods without a break, on-call status 24 hours a day, and carrying weapons .... An investigation is an observation or study by close examination and systematic inquiry." 66 M.S.P.R. at 244 (internal citations omitted).

Regarding the definition of apprehension, the Board stated in *Ferrier* that "[a]pprehension is the 'seizure, taking, or arrest of a person on a criminal charge.'" *Id.* (citing *Black's Law Dictionary* 101 (6th ed. 1990)).

However, these simple definitions of "criminal investigation" and "apprehen-sion" are not determinative of whether Grassi is a LEO. *See Hall v. Dep't of the Treasury*, 264 F.3d 1050, —— – ——, slip op. at 6–8 (Fed.Cir. 2001). As noted by the Board in its decision, a LEO as defined by FERS commonly: (1) has frequent direct contact with criminal suspects; (2) is authorized to carry a firearm; (3) interrogates witnesses and suspects, giving *Miranda* warnings when appropriate; (4) works for long periods without a break; (5) is on call 24 hours a day; and (6) is required to maintain a level of physical fitness. *Bingaman*, 127 F.3d at 1436 (stating that these factors "capture[ ] the essence of what Congress intended"); *Hannon v. Dep't of Justice*, 234 F.3d 674, 677 (Fed.Cir.2000); *Hall*, 264 F.3d aty ——, slip op. at 8. These factors are derived from the Board's construction of "investigation" and "apprehension" of criminal suspects to include only those law enforcement personnel who are most immediately involved in the process of criminal investigation and arrest. Consequently, these factors are considered in determining whether a particular employee investigates or apprehends criminal suspects. Certainly no single factor is essential or dispositive, but each factor bears on the question of whether a particular employee qualifies as a "law enforcement officer" for purposes of entitlement to LEO retirement credit. *Bingaman*, 127 F.3d at 1436.

Based on the facts presented at the hearing, the Board found that Grassi performs no investigative work beyond questioning mostly law abiding citizens at the border, taking declarations, and producing an incident report upon discovery of narcotics. The Board also found that, when handling his dog, Grassi may collect and process evidence or occasionally perform pat-downs, but such tasks are not his pri-

mary duties. The Board further found that Grassi's suspicion that a traveler is carrying narcotics does not rise to the level of probable cause that a crime has been committed, nor does it form the basis for an arrest. The Board noted that, in fact, only one out of every 3,500 vehicles searched by Grassi actually contains narcotics, thus demonstrating that Grassi spends the majority of his time examining law abiding citizens, not investigating criminal suspects. Finally, the Board found that Grassi performs no follow-up investigation.

Regarding apprehension of criminal suspects, the Board found that Grassi does not apprehend criminal suspects because his work at the San Ysidro POE does not allow pursuit of suspects off the fixed site.

Thus, after a thorough analysis of Grassi's job descriptions and his actual duties, the Board found that Grassi has no investigative duties, does not give *Miranda* warnings, is not on-call, and does not make arrests. The Board also found that the duties of Grassi's position are not so rigorous that employment opportunities should be limited to vigorous individuals. Thus, the Board concluded that Grassi's duties were not primarily the investigation, apprehension, or detention of criminal suspects, and therefore held that he is not entitled to LEO service credit for retirement under FERS. We discern no abuse of discretion in the Board's findings and its conclusions drawn therefrom.

Regarding Grassi's analogy to *Sauser*, in *Sauser* the appellant sought LEO service credit under the CSRS for his positions as a Customs Inspector and a Customs Patrol Officer. *Id.* at 492. The Board sustained the administrative judge's determination that Sauser's service as a Customs Inspector and Patrol Officer were creditable, based on a finding that Sauser's area of operations as a Customs Inspector and

Patrol Officer was characterized by an especially heavy flow of drug smuggling and the importation of other illegal contraband. *Id.* at 493. Therefore, the Board found, Sauser was regularly required to investigate and apprehend individuals suspected of violating the criminal laws of the United States. *Id.* at 493–94. The Board further found that Sauser engaged in surveillance and other intelligence-gathering activities specifically targeted at halting the criminal activities of suspected smugglers. *Id.* at 494. Sauser "frequently pursued and helped apprehend suspected criminals in situations involving great danger to himself and ... he was ... injured on a few of those occasions." *Id.* Sauser had completed advanced tactical firearms instruction as part of his duties, and he was a member of a high risk Warrant Entry Tactical Team involving the use of special weapons and tactics. *Id.* Based on these aspects of Sauser's duties, the Board concluded that he was entitled to LEO service credit. *Id.*

Grassi's duties, however, fall short of those presented in *Sauser*. For example, Grassi did not show that he "frequently pursued and helped apprehend suspected criminals in situations involving great danger to himself," nor did he show that he "has completed advanced tactical firearms instruction, ... and [was] a member of a high-risk Warrant Entry Tactical Team involving the use of special weapons and tactics." *Id.* Thus, the Board's conclusion that Grassi was not entitled to LEO service credit is not in conflict with *Sauser*, and the Board did not abuse its discretion in coming to a conclusion that is contrary to *Sauser*.

Regarding Grassi's analogy to *Ferrier*, we note that in *Ferrier*, the Board granted LEO service credit to a Fish and Wildlife Service police officer whose duties were commensurate with state and local police officers in the area surrounding the refuge.

66 M.S.P.R. at 244, 250. He investigated crimes, had authority to arrest, carried a firearm, had to respond to calls even when off-duty, and could be called upon to work long hours. *Id.* at 245. His duties could involve strenuous exertion and adverse weather conditions. *Id.* Ferrier investigated suspected criminal activity, and apprehended and detained suspects. *Id.* at 246. He engaged in a high-speed car chase and then pursued the suspect on foot and over a ten-foot wall, eventually apprehending and arresting him. *Id.* at 246–47. He was called from home one night to investigate a trespass and unauthorized firearm use, and he apprehended the individuals. He has restrained a drunk attacking him with a baseball bat. *Id.* at 247.

Grassi's duties fall short of those presented in *Ferrier*. Grassi did not show that he has ever responded to calls when off-duty, or that he has ever pursued a suspect via a high-speed car or foot chase. Grassi has never arrested anyone, and he did not assert that duties were commensurate with state and local police officers in the area surrounding the San Ysidro POE. Thus, *Ferrier* does not necessitate a conclusion by the Board that Grassi was entitled to LEO service credit, and the Board did not abuse its discretion in failing to so conclude. Thus, the Board did not fail to follow *Sauser* and *Ferrier*, because these cases are distinguishable on their facts.

Because the Board applied the proper definition of the terms "investigation" and "apprehend" in analyzing Grassi's duties as a CEO, and because the Board did not misapply the law by failing to find that Grassi was entitled to LEO service credit under *Sauser* and *Ferrier*, we affirm the Board's determination that Grassi's duties are not primarily "the investigation, appre-

hension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States," as required by 5 U.S.C. § 8401(17).

## II

Grassi also argues that the Board erred in relying on 5 C.F.R. § 842.802 to deny his request for LEO service credit. The statutory definition of "law enforcement officer" is set forth in 5 U.S.C. § 8401(17) as an employee, the duties of whose position are primarily "the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States." Section 842.802 further defines "law enforcement officer" to exclude employees "whose primary duties involve maintaining order, protecting life and property, guarding against or inspecting for violations of law, or investigating persons other than those who are suspected or convicted of offenses against the criminal laws of the United States."

Grassi appears to be arguing that the Board erroneously viewed 5 U.S.C. § 8401(17) and 5 C.F.R. § 842.802 as an either/or proposition. However, upon reviewing the Board's decision, we cannot say that the Board so erred. Regarding section 842.802, the Board found that the primary mission of a CEO is to interdict narcotics, not to investigate, apprehend, or detain persons suspected of violating the criminal laws.* The Board also found that Grassi spends the majority of his time examining law abiding citizens, and that his primary duty is to inspect for violations of the law or to investigate persons other than those who are suspected or convicted

---

* In the Initial Decision, the administrative judge states "I find such detention does not fall within the meaning of 5 C.F.R.

§ 842.802." This court finds no such regulation, and assumes that the administrative judge is referring to 5 C.F.R. § 842.802.

of offenses against the criminal laws of the United States.

Despite some reference to 5 C.F.R. § 842.802, the Board performed a thorough analysis of the statutory requirements of 5 U.S.C. § 8401(17) in determining that Grassi's duties were not primarily the investigation, apprehension, or detention of criminal suspects. The Board did not merely rely on 5 C.F.R. § 842.802 to deny his request for LEO service credit. Based on the evidence presented by Grassi, the Board also concluded that Grassi had not established law enforcement officer status under the statute. We hold that the Board did not erroneously *rely on* 5 C.F.R. § 842.802 to deny Grassi's request for LEO service credit, nor did it abuse its discretion in determining that Grassi was not entitled to LEO service credit.

### CONCLUSION

Because the Board's decision is not arbitrary, capricious, or an abuse of discretion, and is otherwise in accordance with the law, we affirm.