**Valerio JORGE, Petitioner,**

v.

**DEPARTMENT OF THE TREASURY, Respondent.**

No. 00–3068.

United States Court of Appeals, Federal Circuit.

Oct. 1, 2001.

Before NEWMAN, RADER, and LINN, Circuit Judges.

LINN, Circuit Judge.

Valerio Jorge appeals the decision of the Merit Systems Protection Board ("Board"), affirming the decision of the Department of the Treasury ("Treasury") that his service as a Customs Inspector does not entitle him to "law enforcement officer" retirement credit under the Civil Service Retirement System ("CSRS"). *Jorge v. Dep't of the Treasury,* No. AT–0831–98–0954–I–2 (M.S.P.B. Oct. 5, 1999). Because the Board's decision to deny LEO service credit for the period at issue in this appeal is not arbitrary, capricious, or an abuse of discretion, and is otherwise in accordance with law, we *affirm* the Board's denial of service credit for the period at issue in this appeal. However, because Treasury waived its timeliness defense with respect to Jorge's request for LEO credit based on his individual duties, we hold that the Board erred in restricting the time period at issue in Jorge's appeal. Thus, we *reverse* that portion of the decision and *remand* for a determination of

whether Jorge's previous duties qualify for the service credit he requests.

## BACKGROUND

Jorge is a Senior Customs Inspector covered by the CSRS. At the time of the Board's initial decision, Jorge was sixty years old and performing his duties as a Senior Customs Inspector. He has worked as a Customs Inspector in Miami, Florida, since 1987. Since December 1993, Jorge has been permanently assigned as a Customs Inspector at three duty stations in Miami: (1) the Contraband Enforcement Team Outbound from December 23, 1993 through June 11, 1994; (2) the courier facilities from June 12, 1994 through September 30, 1994; and (3) the inbond/informal desk since October 1, 1994.

The position description for a Senior Customs Inspector states that the incumbent performs a wide range of complex advisory and coordinating duties, and other specialized assignments involving highly sensitive inspection and control issues. The Inspector must maintain proficiency in firearm use and be able to detect unusual behavior, merchandise, or documentation indicating possible violations, and take appropriate action to enforce the laws of Customs and other agencies.

The position description recognizes that contact with others may become hostile upon discovery of a violation of law. The position description also states that an Inspector's work requires strenuous physical exertion such as: (1) lifting heavy objects; (2) crouching, crawling, and climbing to perform inspections of cargo, baggage, and vehicles; and (3) defending oneself or others against physical attack, using firearms only as a last resort.

Between December 23, 1993 and June 11, 1994, Jorge worked eight hours per day, 5 days per week, as an Inspector on the Contraband Enforcement Team Outbound. As a member of the Enforcement Team, Jorge searched cargo in warehouses and examined passengers and their luggage to prevent the unreported exportation of currency from the United States. Jorge's Enforcement Team position description stated that he was to analyze information and identify shipments or passenger arrivals that were high-risk and required a more in-depth inspection. He had to plan the actions to be taken, coordinate team members and others, and lead the actions.

When searching cargo warehouses as a member of the Enforcement Team, Jorge visited two or three warehouses each day. At each warehouse, he spent about forty-five minutes reviewing shipping documents to identify cargo shipments for inspection. Although Jorge testified that he spoke with people in the warehouses, there is no evidence that he asked questions requiring *Miranda* warnings or for the purpose of criminally prosecuting anyone. The questions related to the location of cargo, examination of cargo, returning cargo to its place, and the existence of any suspicious activity observed by warehouse employees. Although Jorge testified that he "surveilled" the loading of cargo flights, the Board found it more accurate to describe what he did as observing the loading of cargo flights from a distance.

When examining passengers and their luggage, Jorge worked three or four passenger flights per day. To search outbound luggage for unreported currency, the bags were x-rayed and sniffed by detector dogs. If currency was detected via x-ray or dog, Jorge, with the assistance of the National Guard, would search the luggage. After the luggage was searched, Jorge went to the passenger jetways to inspect departing passengers, who had already been screened by the airport for

weapons. He could not inspect every passenger, so he selected passengers at random or based on their appearance and demeanor. He would also ask passengers certain routine currency questions, and might even pat-down the passenger. Jorge testified that he performed about two pat-downs each day. Although he testified that he has asked passengers to raise their shirts or drop their pants, he could not recall any resulting seizures. Jorge testified that, as a member of the Enforcement Team, he found currency many times. However, another employee testified that currency was found in warehouses once or twice a month at most. Jorge also testified that, at times, he arrested individuals when he detained them and also gave them *Miranda* warnings because they were not free to go. However, the Board noted that written policy states that the Office of Enforcement (i.e., a Special Agent) will make any needed arrests.

From June 12, 1994 through September 30, 1994, Jorge worked five days per week, eight hours per day, at the Courier Facilities located within the perimeter of the airport. International express consignment carrier packages, ranging from documents to intangibles arriving from foreign countries, are brought to the Courier Facilities before being delivered by the couriers (e.g., Federal Express and United Parcel Service). Due to a high volume of incoming packages, Inspectors cannot examine every package. Inspectors review manifests and airway bills, x-ray packages, and utilize detector dogs to identify packages for inspection. If contraband is found, the Inspector must call his supervisor, who must call a Special Agent to take over the matter.

In Courier Facilities, Jorge worked overtime and carried a gun. However, he was not authorized to carry a weapon twenty-four hours a day. He was not on call twenty-four hours a day and was not required to participate in a mandatory physical fitness program. He did not give *Miranda* warnings or interrogate suspects, and he was able to take necessary breaks. Jorge admitted that, while working in Courier Facilities, he primarily searched courier packages and never arrested anyone.

From October 1994 through the time of his appeal to the Board, Jorge worked eight hours per day, five days per week, at the inbond/informal desk in a professional building located a few miles from the airport passenger terminals. In performing his duties at the inbond/informal desk, Jorge sat behind a glass partition, reviewed documentation, and processed inbond and informal transactions.

Inbonds are merchandise, protected by a bond, which enter the country enroute to another U.S. port for entry or exportation to other countries. Informals are shipments sought to be cleared for importation and valued at less than two thousand dollars. Individuals seeking to process or clear merchandise present paperwork to the inbond/informal Inspectors while the merchandise is stored in a separate warehouse.

The Inspectors review the paperwork and question the individuals seeking to clear the merchandise. Based on information received, the Inspectors can either clear or hold the shipment. Due to the high volume of paperwork and the perishable nature of some goods, Inspectors must look at the paperwork quickly and make quick decisions.

Until 1998, in addition to primarily processing cargo behind a desk, Jorge spent approximately one hour per day maintaining statistics of the desk transactions. In addition, until 1997, he spent approximately one hour per day processing paperwork

dropped off by people who sought to export vehicles. Although Jorge testified that he physically inspected cargo when he first began to work at the inbond/informal desk, another employee testified that Jorge rarely physically examined merchandise.

Although there was some doubt as to the completeness of the agency's records regarding arrests, those records only list three instances in which Jorge was listed as the seizing, arresting, or searching officer. Of those three instances, only one of them was a criminal matter. Jorge only identified one incident in over five years at the inbond/informal desk, where he had direct contact with a known criminal suspect. That individual was arrested for overstaying his VISA, which is not in itself a criminal matter.

While working at the inbond/informal desk, Jorge was authorized to keep his weapon in a locker, he never aimed his weapon, never pursued a fleeing suspect on foot, never received threats of violence, never engaged in surveillance, and never incurred physical harm. While he worked overtime, he was allowed to take breaks, he was not authorized to carry a weapon twenty-four hours a day, and he was not required to participate in a physical fitness program.

Based on these facts, the Board concluded that Jorge's duties as a Customs Inspector did not demonstrate the frequent direct contact with criminal suspects that is characteristic of law enforcement work. The Board further concluded that Jorge's duties were not primarily the investigation, apprehension, or detention of criminal suspects. Jorge seeks LEO retirement credit for the full-time and overtime work that he performed as a Customs Inspector, and he therefore appeals the Board's denial of LEO service credit. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9) (1994).

## DISCUSSION

### Standard of Review

This court must affirm an MSPB decision unless it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c)(1)-(3) (1994); *Hayes v. Dep't of the Navy*, 727 F.2d 1535, 1537 (Fed.Cir. 1984). The burden of establishing reversible error in the Board's decision rests upon Jorge. *Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed.Cir. 1998).

## DISCUSSION

### Analysis

#### I

■ Jorge seeks LEO retirement credit under the CSRS. 5 U.S.C. § 8336(c)(1) (1994); 5 U.S.C. § 8331(20) (1994). Jorge argues that he "investigates" and "apprehends" criminal suspects as required under the CSRS LEO retirement statutes. Jorge also contends that his duties are analogous to *Sauser v. Office of Personnel Management*, 59 M.S.P.R. 489 (1993), in which the Board determined that the appellant was entitled to LEO service credit. Thus, he alleges that the Board's determination that he was not entitled to LEO service credit for his duties as a Customs Inspector was based on a misapplication of statutory and regulatory standards and Board precedent and, therefore, was arbitrary, capricious, and contrary to law.

The relevant CSRS LEO retirement statute states:

An employee who is separated from the service after becoming 50 years of age and completing 20 years of service as a

law enforcement officer ... is entitled to an annuity.

5 U.S.C. § 8336(c)(1) (1994). "Law enforcement officer" is statutorily defined as:

an employee, the duties of whose position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States.

5 U.S.C. § 8331(20) (1994).

The "primary duties" of a position are those that "[a]re paramount in influence or weight; that is, constitute the basic reasons for the existence of the position; [o]ccupy a substantial portion of the individual's working time over a typical work cycle; and [a]re assigned on a regular and recurring basis." 5 C.F.R. § 831.902(1) (2000).

In *Hall v. Dep't of Treasury*, 264 F.3d 1050 (Fed.Cir.2001), we extensively discussed the meaning of the words "investigation" and "apprehension" in 5 U.S.C. § 8331(20), noting that an LEO as defined by CSRS commonly: (1) has frequent direct contact with criminal suspects; (2) is authorized to carry a firearm; (3) interrogates witnesses and suspects, giving *Miranda* warnings when appropriate; (4) works for long periods without a break; (5) is on call 24 hours a day; and (6) is required to maintain a level of physical fitness. *Hall*, 264 F.3d at 1053–54, citing *Bingaman v. Dep't of the Treasury*, 127 F.3d 1431, 1436 (Fed.Cir.1997). As noted in *Hall*, these factors are derived from the Board's construction of "investigation" and "apprehension" of criminal suspects to include only those law enforcement personnel who are most immediately involved in the process of criminal investigation and arrest. Consequently, these factors are considered in determining whether a particular employee investigates or apprehends criminal suspects. Certainly no single factor is essential or dispositive, but

each factor bears on the question of whether a particular employee qualifies as a "law enforcement officer" for purposes of entitlement to LEO retirement credit. *Hall*, 264 F.3d at 1055.

Based on the facts presented at the hearing, the Board found that Jorge was not involved in front-line law enforcement work and he did not have frequent direct contact with known or suspected criminals. Jorge was authorized to carry a firearm, but only at work and during travel to and from work, and thus he was not authorized to carry a weapon 24 hours a day.

Regarding apprehension of criminal suspects, the Board found that Jorge held people against their will for the purpose of further investigation by a Special Agent, possibly giving *Miranda* warnings and asking further questions, but that these facts do not constitute an investigation. Jorge admitted that he never raised a weapon at a criminal suspect, never received threats of physical violence, never pursued a fleeing suspect on foot, never took someone to the ground, never participated in a high speed vehicle pursuit, and never confronted a hostage or other terrorist situation. The Board also noted that Jorge was not on call 24 hours a day, was permitted to take necessary breaks, and was not required to participate in a physical fitness program.

The Board thus found that the overwhelming evidence of record shows that Jorge did not primarily investigate, apprehend, or detain known or suspected criminals in his work as a Customs Inspector. The Board also found that Jorge's duties were not sufficiently rigorous that employment should be limited to young, physically vigorous employees. In sum, although Jorge met some of the criteria for LEO status, such as carrying a firearm, conducting pat-down searches, and giving *Mi-*

*randa* warnings when necessary, the Board found that Jorge had not shown that his position or his individual service constituted work for which he should receive LEO service credit.

Regarding Jorge's analogy to *Sauser*, in *Sauser* the appellant sought LEO service credit under the CSRS for his positions as a Customs Inspector and a Customs Patrol Officer. *Sauser*, 59 M.S.P.R. at 492. The Board sustained the administrative judge's determination that Sauser's service as a Customs Inspector and Patrol Officer were creditable, based on a finding that Sauser's area of operations as a Customs Inspector and Patrol Officer was characterized by an especially heavy flow of drug smuggling and the importation of other illegal contraband. *Id.* at 493. Therefore, the Board found, Sauser was regularly required to investigate and apprehend individuals suspected of violating the criminal laws of the United States. *Id.* at 493–94. The Board further found that Sauser engaged in surveillance and other intelligence-gathering activities specifically targeted at halting the criminal activities of suspected smugglers. *Id.* at 494. Sauser "frequently pursued and helped apprehend suspected criminals in situations involving great danger to himself and ... he was ... injured on a few of those occasions." *Id.* Sauser had completed advanced tactical firearms instruction as part of his duties, and he was a member of a high risk Warrant Entry Tactical Team involving the use of special weapons and tactics. *Id.* Based on these aspects of Sauser's duties, the Board concluded that he was entitled to LEO service credit. *Id.*

Jorge's duties, however, fall short of the factual scenario of *Sauser*. Jorge failed to show that he "frequently pursued and helped apprehend suspected criminals," nor did he show that he "has completed advanced tactical firearms instruction, ...

and [was] a member of a high-risk Warrant Entry Tactical Team involving the use of special weapons and tactics." *Id.* Thus, *Sauser* did not necessitate a conclusion by the Board that Jorge was entitled to LEO service credit, and the Board did not abuse its discretion in failing to so conclude. Thus, the Board did not fail to follow *Sauser*, because that case is distinguishable on its facts.

Because the Board applied the proper definition of the terms "investigation" and "apprehend" in analyzing Jorge's duties as a Customs Inspector, and because the Board did not misapply the law by failing to find that Jorge was entitled to LEO service credit under *Sauser*, we affirm the Board's determination that Jorge's duties are not primarily "the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States," as required by 5 U.S.C. § 8331(20).

Jorge also argues that the evidence of record shows that his duties were physically demanding and hazardous and therefore that he is entitled to LEO service credit under *Ferrier*. In *Ferrier*, the Board granted LEO service credit to a Fish and Wildlife Service police officer whose duties were commensurate with state and local police officers in the area surrounding the refuge. 66 M.S.P.R. at 244, 250. He investigated crimes, had authority to arrest, carried a firearm, had to respond to calls even when off-duty, and could be called upon to work long hours. *Id.* at 245. His duties could involve strenuous exertion and adverse weather conditions. *Id.* Ferrier investigated suspected criminal activity, and apprehended and detained suspects. *Id.* at 246. He engaged in a high-speed car chase and then pursued the suspect on foot and over a ten-foot wall, eventually apprehending and arresting him. *Id.* He was called from home one night to investi-

gate a trespass and unauthorized firearm use, and he apprehended the individuals. *Id.* at 246–47. He also restrained a drunk attacking him with a baseball bat. *Id.* at 247.

Jorge's duties fall short of those presented in *Ferrier.* Jorge did not show that he has ever responded to calls when off-duty, or that he has ever pursued a suspect via a high-speed car or foot chase. Jorge has never arrested anyone, and he did not assert that his duties were commensurate with state and local police officers in the area surrounding his duty station, the Miami International Airport. Thus, *Ferrier* does not necessitate a conclusion by the Board that Jorge was entitled to LEO service credit, and the Board did not abuse its discretion in failing to so conclude. Thus, the Board did not fail to follow *Ferrier,* because that case is distinguishable on its facts.

## II

Jorge also argues that the Board erred in relying on 5 C.F.R. § 831.902 to deny his request for LEO service credit. Jorge appears to be arguing that the Board erroneously viewed 5 U.S.C. § 8331(20) and 5 C.F.R. § 831.902 as an either/or proposition. We recently confirmed in *Hall* that the statute and the regulation are not to be read as an either/or proposition. Here, as in *Hall,* we find that the Board thoroughly considered all of the relevant factors and determined that Jorge was not primarily engaged in LEO activities. We find no basis to conclude that the Board erroneously relied on 5 C.F.R. § 831.902 to deny Jorge's request for LEO service credit or abused its discretion in determining that Jorge was not entitled to LEO service credit under the statute.

## III

Jorge finally argues that 5 C.F.R. § 831.906(e), which was relied on by the Board to limit Jorge's retroactive LEO service credit and thereby limit the scope of his appeal, is invalid. Section 831.906(e) states:

> Coverage in a position or credit for past service will not be granted for a period greater than 1 year prior to the date that the request from an individual is received under paragraphs (b), (c), or (d) of this section by the employing agency, the agency where past service was performed, or OPM.

5 C.F.R. § 831.906(e) (2000).

Jorge alleges that this regulation is invalid because: (1) it is contrary to the plain text of the statutory provisions that comprise the CSRS; and (2) it is an arbitrary and unreasonable exercise of the Office of Personnel Management's ("OPM") regulatory authority. Jorge also argues that even if the regulation is valid, the Board erred when it failed to find that Treasury waived the one-year restriction on the scope of Jorge's request for LEO service credit.

■ We first consider Jorge's waiver argument because it is dispositive on this issue. In its denial of Jorge's requests for LEO service credit, Treasury noted that his request for position coverage was untimely. However, with respect to his individual request for coverage, Treasury failed to address the timeliness of his request. Treasury considered Jorge's service as a Customs Inspector beginning in 1987, and did not limit its analysis to a period beginning in December 1993.

The Board considered Jorge's argument that Treasury did not address timeliness with respect to individual coverage, but rejected the notion that Treasury's failure to address the question operated as a waiver, stating that Treasury's finding pertaining to Jorge's position coverage re-

quest was sufficient to pertain to the individual service request. We disagree.

The waiver issue was raised and addressed in *Hall.* In that case, we adopted the position of the Seventh Circuit in *Ester v. Principi*, 250 F.3d 1068, 1071–72 (7th Cir.2001) and held that an agency waives its timeliness defense when it decides the merits of a complaint without addressing the question of timeliness. *Hall*, at 1061.

In this case, Treasury's denial of Jorge's requests for LEO service credit based on his individual duties was decided on the merits. Treasury considered Jorge's service as a Customs Inspector beginning in 1987. Although Treasury applied section 831.906 in its denial of Jorge's request for position coverage and found the request untimely, Treasury did not mention section 831.906 in its denial of Jorge's request for LEO service credit based on his individual duties. We hold that Treasury waived its timeliness defense under section 831.906(e) with respect to Jorge's request for LEO service credit based on his individual duties. In light of our holding, we need not and do not address the validity of the regulation.

## CONCLUSION

Because the Board's decision to deny LEO service credit to Jorge for the time period at issue in this appeal is not arbitrary, capricious, or an abuse of discretion, and is otherwise in accordance with law, we affirm the Board's decision. However, because Treasury waived its timeliness defense with respect to Jorge's request for individual coverage, we hold that the Board erred in restricting the time period at issue in Jorge's appeal. Thus, we reverse that portion of the decision and remand for a determination of whether

Jorge's previous duties qualify for the service credit he requests.